Andrew T. Tutt (SBN 343206)
**TRIAL LAWYERS FOR JUSTICE**
8235 Santa Monica Blvd.
West Hollywood, CA 90046
Telephone: (919) 699-5905
andrew@tl4j.com

R. Stanton Jones (DC Bar No. 987088)*
**TRIAL LAWYERS FOR JUSTICE**
421 W. Water Street
Decorah, IA 52101
Telephone: (307) 288-4400
stanton@tl4j.com

Ana Juneja (WY Bar No. 8-7159)*
**ANA LAW LLC**
75 E. 3rd Street
Sheridan, WY 82801
Telephone: (307) 207-8500
ana@analaw.com

*Attorneys for Plaintiff TradeSun, Inc.*

* Application for *pro hac vice* admission forthcoming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| TRADESUN, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>OPENAI OPCO, LLC, a Delaware limited liability company; and OPENAI GROUP PBC, a Delaware public benefit corporation,<br><br>Defendants. | Case No. 3:26-cv-11360<br><br>**COMPLAINT FOR:**<br>1. Federal Trademark Infringement (15 U.S.C. § 1114);<br>2. False Designation of Origin and False Association (15 U.S.C. § 1125(a));<br>3. Trademark Infringement (California Common Law);<br>4. Unfair Competition (California Common Law); and<br>5. Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This is an action to stop one of the world's largest technology companies from taking the name of a smaller California company's flagship product in violation of settled trademark law. Since 2021, Plaintiff TradeSun, Inc. ("TradeSun") has sold enterprise AI software under the name ASTRA®. TradeSun built the technology, won banks and other enterprises as customers, and in 2022 secured a federal registration for ASTRA® on the Principal Register for AI software services. In August 2026, Defendants ("OpenAI") announced that their new flagship AI model would be called "Astra." OpenAI launched its Astra commercially in September 2026 and has since put the full weight of the largest distribution network in the AI industry behind that name.

2. OpenAI adopted the Astra name for AI services that it markets, by name and from this District, for the same enterprise, financial, and compliance work that TradeSun's ASTRA® has performed for TradeSun's enterprise customers for years: reading documents and artifacts, extracting and reconciling data, screening for risk and fraud, agentically interfacing with external technology and platforms, labeling and learning from prior and live transaction data and human behavior, and automating multi-step workflows for banks, financial institutions, and other enterprises. The marks are identical. The services are closely related. The customers are the same.

3. The result is a textbook case of reverse confusion. OpenAI reports more than one billion weekly active users and 2.5 million business customers across its products. By saturating the market with "Astra," OpenAI is teaching the public that Astra means OpenAI. Customers who encounter TradeSun's ASTRA® are now likely to assume that TradeSun's product is OpenAI's, is built on OpenAI's model, or is offered with OpenAI's sponsorship or approval, or, worse, that TradeSun is the imitator trying to latch onto OpenAI's Astra brand. The senior user is being made to look like the junior user. That is precisely the injury the Lanham Act exists to prevent.

4. OpenAI had every opportunity to avoid this. TradeSun's federal registration had been on the public register for more than four years when OpenAI chose the name, and any search for "Astra" in connection with AI software would have immediately found it. OpenAI is a sophisticated company that files and polices its own trademarks, and it has twice in the past year been

restrained by judges of this District from using other companies' marks for its products. OpenAI nonetheless adopted TradeSun's registered mark for its most important product without seeking TradeSun's consent, and OpenAI continues to expand the "Astra" family with each passing week.

5. TradeSun brings this action to preserve the identity it built first. It seeks injunctive relief, disgorgement of OpenAI's profits attributable to the infringement, its own damages, and the other relief that federal and California law provide. OpenAI's size does not entitle it to TradeSun's name.

## THE PARTIES

6. Plaintiff TradeSun, Inc. is a Delaware corporation founded in 2018, with its principal place of business at 2196 Carmel Valley Road, Del Mar, California 92014.

7. Defendant OpenAI OpCo, LLC ("OpCo") is a Delaware limited liability company with its principal place of business at 1455 3rd Street, San Francisco, California 94158. OpenAI's U.S. services agreement identifies OpCo as the contracting entity for OpenAI's U.S. business customers. OpCo offers, provides, and sells the AI services marketed under the Astra name in the United States, including through OpenAI's developer platform and enterprise offerings.

8. Defendant OpenAI Group PBC ("Group") is a Delaware public benefit corporation with its principal place of business in San Francisco, California. OpenAI publicly identifies Group as its commercial public benefit corporation. On information and belief, Group directs and participates in the naming, commercial strategy, launch, and promotion of the Astra model family, including the campaigns and product materials described below.

9. OpCo and Group are referred to together as "OpenAI" or "Defendants." On information and belief, Defendants jointly approved and implemented the U.S. launch and promotion of Astra: Group directed the branding and commercial strategy, and OpCo offered, supplied, and contracted for the branded services with U.S. customers. Each Defendant is liable for the acts alleged below in which it participated, authorized, directed, or ratified. Information about the allocation of responsibility among OpenAI's entities and personnel is principally in OpenAI's possession.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over TradeSun's Lanham Act claims under

15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a). The Court has jurisdiction over TradeSun's California claims under 28 U.S.C. §§ 1338(b) and 1367(a), because those claims are joined with substantial and related federal trademark claims and arise from the same nucleus of operative facts: Defendants' adoption, advertising, provision, and sale of AI services under the Astra name.

11. This Court has personal jurisdiction over each Defendant. Each maintains its principal place of business in this District and is at home here. Each also directed or participated, from this District, in the branding, promotion, and commercial provision of Astra challenged in this Complaint, offered the branded services to California customers, and caused injury to a California business. TradeSun's claims arise from and relate to those forum activities.

12. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendants reside in this District, and a substantial part of the events giving rise to the claims occurred here. On information and belief, the decision to adopt the Astra name, the launch, and the marketing and U.S. commercial offering of Astra-branded services were developed, authorized, or carried out from Defendants' San Francisco headquarters.

13. Intradistrict Assignment. Under Civil Local Rule 3-2(c), this is an Intellectual Property Action subject to district-wide assignment. A substantial part of the events giving rise to the claims also occurred in San Francisco County, where Defendants are headquartered.

## FACTUAL ALLEGATIONS

### A. TradeSun Builds ASTRA® Into a Brand for Enterprise AI

14. TradeSun was founded in 2018 by its CEO, Nigel Hook, to bring artificial intelligence and automation to complex, information-intensive business operations. TradeSun develops and supplies commercial AI software and technology that helps enterprises take information spread across business records, systems, and transactions and convert it into analysis and action.

15. TradeSun has used ASTRA® as the name of its AI technology continuously since at least May 2021. TradeSun's federal trademark application, filed May 28, 2021, claimed first use of the mark in commerce on May 21, 2021. On August 12, 2021, TradeSun publicly announced its "Astra AI Trade Finance Platform," placing ASTRA® in enterprise banking deployments five

years before OpenAI's launch.

16. From the outset, TradeSun's ASTRA® has applied AI to connected enterprise workflows: recognizing and classifying incoming materials, extracting and mapping data, comparing and reconciling records, identifying inconsistencies and discrepancies, evaluating compliance and risk, detecting fraud, and supporting decisions. TradeSun's marketing has consistently described ASTRA® in terms of natural-language processing, machine learning, document classification, data extraction, analytics, compliance, and risk analysis.

17. Today, TradeSun's ASTRA® is an agentic artificial-intelligence platform that assigns complementary tasks to specialized AI agents. The Gatekeeper agent classifies incoming materials; the Interpreter agent extracts and maps information; and the Resolver agent cross-verifies information across records. Working together, these AI agents automate enterprise analysis, flag discrepancies and risk, and identify issues that require human action. The system learns from each human interaction.

18. TradeSun markets and sells ASTRA® to banks, financial institutions, importers, exporters, and other participants in commercial and financial workflows. Those customers use ASTRA® to perform consequential work, including reconciling transaction records, analyzing financial and trade information, screening for financial-crime risk, detecting fraud, and evaluating regulatory compliance. ASTRA® has generated substantial commercial revenue, and TradeSun has invested years of development, marketing, and customer work in the product and its name.

19. TradeSun promotes ASTRA® through its public website, commercial announcements, industry conferences and publications, relationships with systems integrators and technology providers, and direct sales efforts to enterprises. Its customers and prospects encounter the ASTRA® name when evaluating artificial-intelligence services for their business operations.

20. ASTRA® is an arbitrary mark as applied to AI software. The word is Latin for "stars." It does not describe, and has no connection to, document classification, data extraction, reconciliation, compliance, or any other function of TradeSun's software. TradeSun selected ASTRA® precisely because it was distinctive, and the mark is inherently distinctive and conceptually strong.

21. Through TradeSun's continuous use, marketing, and commercial success, ASTRA® has come to identify TradeSun as the source of the AI services sold under that name, and the mark has acquired valuable goodwill among TradeSun's customers, prospects, integrators, and partners.

**B. TradeSun Secures Federal Registration of ASTRA®**

22. TradeSun owns United States Trademark Registration No. 6,746,198 for the standard-character mark ASTRA®, which issued on the Principal Register on May 31, 2022 (the "ASTRA Registration"). A true and correct copy of the registration certificate is attached as **Exhibit A**.

23. The ASTRA Registration covers the following services in International Class 42: "Software as a service (SAAS) services featuring software using artificial intelligence for document classification, data extraction, and processing of data within any line of business software application." The identification of services is not limited to trade finance, to any industry, or to any type of business record. By its terms, it extends to artificial-intelligence software used to classify documents, extract data, and process data "within any line of business software application."

24. TradeSun filed the underlying use-based application, Serial No. 90/742,200, on May 28, 2021, claiming first use and first use in commerce on May 21, 2021, and submitted specimens showing ASTRA® used in the advertising of TradeSun's artificial-intelligence services. The United States Patent and Trademark Office examined the application, found no conflicting registration, and published the mark for opposition on March 15, 2022. No opposition was filed, and the registration issued on May 31, 2022.

25. The ASTRA Registration is valid and subsisting. Under 15 U.S.C. §§ 1057(b) and 1115(a), it is prima facie evidence of the validity of the ASTRA® mark, of TradeSun's ownership of the mark, and of TradeSun's exclusive right to use ASTRA® in commerce in connection with the registered services. Under 15 U.S.C. § 1072, the registration has provided constructive notice of TradeSun's claim of ownership since May 31, 2022.

26. In addition to its registered rights, TradeSun owns common-law rights in ASTRA® arising from its continuous use of the mark in commerce since 2021 and the goodwill associated with that use. TradeSun's rights are senior to any rights OpenAI could claim in Astra, which

OpenAI did not adopt until 2026.

27. TradeSun displays ASTRA® with the federal registration symbol ® on its website and in its marketing materials.

28. TradeSun has never assigned or licensed its rights in ASTRA® to OpenAI, has never consented to OpenAI's use of Astra, and has no affiliation with OpenAI of any kind.

**C. OpenAI Adopts the Identical Mark for Its Flagship AI Model**

29. On August 7, 2026, OpenAI announced a new AI model, "Astra." On September 3, 2026, OpenAI commercially released it. OpenAI's published model catalog identifies Astra as a "flagship model," and OpenAI describes Astra as its "flagship model for complex reasoning and coding." OpenAI's launch materials position Astra for complex professional work and advertise its ability to carry out extended, multi-step tasks, use tools, and produce business work product.

30. OpenAI's senior leadership has personally reinforced that positioning. On September 3, 2026, OpenAI's chief executive, Sam Altman, announced on X that "GPT-6 Astra is here" and stated that OpenAI believed it was "the best model in the world" for computer use, professional work, science, coding, and cybersecurity. At the press call announcing Astra that day, OpenAI President Greg Brockman concluded: "Welcome to the AGI era."

31. OpenAI uses Astra as a trademark: a name that identifies and distinguishes its commercially supplied AI services. It promotes Astra as a product brand with its own identity, capabilities, pricing, and commercial positioning. The name appears in product headings, model descriptions, and promotional materials, and in the published model identifier "gpt-6-astra" that developers must use to purchase and call the service. OpenAI also repeatedly uses "Astra" standing alone, without the "GPT-6" prefix, when describing the product's capabilities and urging customers to adopt it.

32. Altman has repeatedly promoted the model using "Astra" alone, without the "GPT-6" prefix. On September 1, 2026, he wrote on X: "Astra is very good and we are excited to see what people will build with it." On September 3, 2026, he told customers: "We are working towards getting Astra in everyone's hands as quickly as we can." On September 5, 2026, he again used

"astra" alone when describing its ability to create a game he could begin playing within minutes. These communications use Astra as the name of the product whose capabilities and availability OpenAI is promoting.

33. OpenAI supplies Astra-branded services through its established commercial channels, including paid ChatGPT subscription plans, ChatGPT for business, Codex, and its application programming interface ("API"). Customers purchase access to the branded services through subscriptions, enterprise agreements, and usage-based developer pricing. OpenAI's model catalog lists GPT-6 Astra at $10 per million input tokens and $50 per million output tokens. Astra is a revenue-generating commercial product.

34. OpenAI also uses Astra as the reference point for promoting its less expensive models. Its September 29, 2026 announcement of GPT-6.1 Sol advertised "Near-Astra intelligence for a fifth of the price," referring to Astra's standard input and output token prices. In posts promoting that release on X, Altman advertised "6.1 Sol at 1/5th of the price of Astra," quoting another post that promoted "near Astra intelligence at one fifth of the price of Astra." Both posts used Astra without the GPT-6 prefix. OpenAI thus presents Astra as a premium offering and a benchmark against which it markets other products.

35. OpenAI's business webpage presents Astra as "intelligence for work" and invites businesses to choose how to "put Astra to work" across OpenAI's products. The page pairs its product descriptions with commercial calls to action, including invitations to try the services and to contact OpenAI's sales team.

36. OpenAI has already built a product family around the Astra name. It offers "GPT-6 Astra Pro"; on September 17, 2026, it introduced "GPT-6 Astra Law"; and on September 29, 2026, it introduced an "Ultrafast" mode for Astra. In each case, "Astra" is the constant, source-identifying element, and the additional terms are descriptive modifiers. Each addition further entrenches Astra as OpenAI's brand.

37. OpenAI also gives Astra a distinct visual identity in its product advertising. On September 22, 2026, OpenAI's @OpenAI account on X published a promotional graphic presenting

Astra, Sol, and Luna as separate illustrated characters within its GPT-6 lineup. The Astra panel prominently displays the Astra name, pairs it with a dedicated character, and describes the product as "Our most intelligent model for the best results," alongside input and output prices. Altman shared the announcement through his X account that day, commenting: "GPT-6 Sol and Luna are great models but also these characters are so cute." This presentation reinforces Astra as a consumer-facing product brand, not merely a technical model designation.

38. OpenAI also distributes Astra through the largest enterprise technology platforms in the world. On September 8, 2026, Amazon Web Services announced the availability of OpenAI's "GPT-6 Astra" through Amazon Bedrock. Astra is likewise distributed through Microsoft's Azure Databricks foundation-model service. These channels place the Astra name in front of every enterprise evaluating and integrating commercial artificial-intelligence services.

39. OpenAI advertises, offers, and supplies Astra-branded services in interstate commerce throughout the United States, including to customers in California and in this District, through its public product pages, developer documentation, sales channels, and U.S. commercial agreements.

40. To date, OpenAI has not filed any application to register ASTRA or any ASTRA-formative mark with the United States Patent and Trademark Office or foreign trademark offices.

**D. OpenAI Markets Astra for the Same Enterprise, Financial, and Compliance Work That TradeSun's ASTRA® Performs**

41. OpenAI's Astra and TradeSun's ASTRA® serve the same business needs. Both apply artificial intelligence to large bodies of business information; both extract, analyze, and reconcile data across documents and records; both string tasks together into automated workflows; and both are promoted to enterprises deciding how to incorporate artificial intelligence into important business operations. The overlap is closest in precisely the enterprise financial, risk, fraud, and compliance work in which TradeSun built its business.

42. On September 10, 2026, OpenAI announced "ChatGPT for Financial Services," promoted Astra for financial-services customers, and identified Morgan Stanley and Evercore as de-

sign partners. OpenAI's materials describe work involving financial statements, investment banking, equity research, and financial modeling. OpenAI is thus marketing Astra, by name, into the financial-services customer base and information-intensive operations in which TradeSun has sold its own ASTRA® AI for years.

43. OpenAI's published customer showcases confirm the overlap. Its "Legora" showcase describes Astra performing financial-statement review, including reconciling information across numerous records and supporting audit and compliance work. Its "Astra for Law" offering promotes Astra for document-intensive professional analysis. Its September 23, 2026 "Harvey" showcase describes Astra working across large bodies of legal documents. Each example involves the same core functions TradeSun's ASTRA® performs, and the same registered services the ASTRA Registration covers: classifying documents, extracting data, and processing data within a line-of-business application.

44. The parties also reach customers through the same channels. Both use public product pages, enterprise marketing, technology and integration partnerships, and direct enterprise sales. Banks, financial institutions, technology providers, and enterprise decisionmakers can and do encounter both companies' Astra-branded offerings while evaluating AI systems for the same work.

45. The overlap is growing. OpenAI has expanded Astra into finance and law within its first month on the market, and on information and belief it will continue to expand Astra into additional enterprise verticals. TradeSun, for its part, has continuously expanded ASTRA®'s capabilities beyond trade finance to broader enterprise document, data, and compliance workflows. For example, TradeSun has added ASTRA® capabilities for customs and shipment-clearance workflows, sanctions screening and money-laundering monitoring, and supplier due diligence and sustainability reporting, including forced-labor risk assessments and carbon accounting. The parties' offerings are converging, not diverging.

### E. OpenAI's Use of Astra Is Likely to Cause Confusion

46. The marks are identical. OpenAI's "Astra" and TradeSun's ASTRA® are the exact

same word, identical in sight, sound, and meaning. TradeSun's standard-character registration protects the wording ASTRA® without limitation to a particular font, style, size, or color.

47. OpenAI's addition of "GPT-6," "Pro," "Law," and similar terms does not dispel confusion. Those terms are model-version designators and descriptors of a product tier or field, keeping Astra as the distinctive, source-identifying element. OpenAI's own marketing reinforces that distinction: Altman has repeatedly used Astra standing alone, and OpenAI separately promotes Astra through distinctive character-based advertising and pricing comparisons. Repeated exposure to "OpenAI's Astra" and "GPT-6 Astra" reinforces the association between Astra and OpenAI, so that customers or prospects who later encounter TradeSun's ASTRA® are likely to assume that TradeSun is an OpenAI affiliate, licensee, or reseller, that its services are built on or endorsed by OpenAI's Astra, or that TradeSun is the imitator that adopted OpenAI's name.

48. The ASTRA® mark is conceptually strong because it is arbitrary as applied to artificial-intelligence software. And OpenAI's Astra is commercially overwhelming. OpenAI has reported more than one billion weekly active users and 2.5 million business customers across its products, and it is using that installed base, its launch announcements, executive social-media promotion and character-based advertising, its product and business pages, its developer documentation, and its distribution agreements with Amazon and Microsoft to build commercial recognition in the Astra name itself on a scale that no company of TradeSun's size could match.

49. The services are closely related, and in substantial part identical. Both TradeSun and OpenAI supply AI software that classifies documents, extracts data, and processes business information for enterprises, including in financial-services and compliance operations.

50. The parties' marketing channels and customers overlap, as described above.

51. The degree of care exercised by purchasers does not prevent confusion here. Even careful enterprise purchasers, who evaluate the source, reliability, security, and commercial relationships behind AI systems, are likely to be confused about affiliation. In today's market, enterprise software products are routinely built on, powered by, or integrated with OpenAI's models, and OpenAI actively promotes such third-party integrations. A sophisticated purchaser encountering

an enterprise AI product named Astra is therefore likely to assume that it is built on, licensed from, or endorsed by OpenAI, an assumption that is wrong and that TradeSun cannot control. The same purchasers are also likely to assume that TradeSun, the smaller company, is the one that adopted the other's name.

52. Both parties are likely to continue expanding into each other's markets, as described above.

53. OpenAI's conduct is therefore likely to cause confusion of at least three kinds: (a) reverse confusion, in which customers attribute TradeSun's ASTRA® services to OpenAI, or believe that TradeSun's services are built on, licensed from, sponsored by, or affiliated with OpenAI; (b) confusion as to affiliation, in which customers believe that OpenAI acquired TradeSun's ASTRA® business, that TradeSun licensed its mark or technology to OpenAI, or that the two companies jointly developed or approved the branded services; and (c) forward confusion, in which customers believe that OpenAI's Astra originates with or is connected to TradeSun. None of those associations exists, and TradeSun has authorized none of them.

**F. OpenAI Adopted Astra With Knowledge of, or in Reckless Disregard of, TradeSun's Rights**

54. When OpenAI announced Astra on August 7, 2026, the ASTRA Registration had been on the public register for more than four years, providing constructive notice of TradeSun's ownership, and TradeSun had been publicly marketing its ASTRA® AI platform for more than five years. The registration expressly covers AI software services. A search of the United States Patent and Trademark Office's records for the exact word "Astra" in connection with software or artificial intelligence would have returned TradeSun's ASTRA Registration immediately.

55. OpenAI is a sophisticated technology company that devotes significant legal resources to registering and enforcing its product names. It has prosecuted and continues to prosecute federal trademark applications for numerous brands, including ChatGPT, GPT, GPT-3, GPT-4, GPT-5, GPT-6, GPT-7, and other GPT-formative marks. And OpenAI aggressively enforces its purported

trademarks. Between April 9, 2024, and September 9, 2026, it initiated at least 89 separate proceedings before the USPTO's Trademark Trial and Appeal Board challenging other parties' marks.

56. OpenAI also knew, from its own recent experience in this District, the consequences of adopting another company's mark without permission. On November 21, 2025, in *Baron App, Inc. v. OpenAI, Inc.*, No. 5:25-cv-09268-EKL, a judge of this Court entered a temporary restraining order against OpenAI's infringing use of the CAMEO mark for a feature of its Sora product. On April 23, 2026, in *IYO, Inc. v. IO Products, Inc.*, No. 3:25-cv-04861-TLT, a judge of this Court preliminarily enjoined OpenAI and its affiliates from using the IO mark for AI-enabled hardware. Both orders issued before OpenAI announced Astra. OpenAI nonetheless chose, for its most important product, a name identical to a federally registered mark for AI software.

57. OpenAI adopted Astra, and continue to promote and expand it, either with actual knowledge of TradeSun's prior rights or in reckless disregard of them. That allegation is based on TradeSun's longstanding public use of ASTRA® for AI software, TradeSun's federal registration, the close relationship between the parties' services, OpenAI's own trademark-registration and enforcement activity, its access to experienced trademark counsel and capacity to conduct clearance, OpenAI's recent experience being enjoined for adopting others' marks in violation of trademark law, and the scale and coordination of OpenAI's Astra launch. The clearance records and naming decisions are within OpenAI's exclusive possession.

58. OpenAI never sought, and TradeSun never gave, permission to use ASTRA®.

59. On information and belief, officers, directors, or managing agents of each Defendant authorized, directed, or ratified the decision to adopt the Astra name and the continued U.S. launch, promotion, and expansion of Astra-branded services. The naming of a flagship model is a significant corporate decision made at the highest levels of OpenAI's business.

60. OpenAI's use of Astra continues and is expanding. Every new Astra-branded offering, announcement, and distribution channel increases the exposure of the infringing mark and deepens the public association between Astra and OpenAI. Unless restrained, OpenAI will continue to use Astra in commerce and will further entrench that association at TradeSun's expense.

### G. OpenAI's Infringement Is Causing TradeSun Irreparable Harm

61. TradeSun's ASTRA® mark embodies years of investment and commercial goodwill. OpenAI's use of the identical mark for related services deprives TradeSun of the ability to control the meaning of its own name. Each new Astra promotion by OpenAI teaches the market that Astra means OpenAI, and each such lesson weakens ASTRA®'s capacity to identify TradeSun as the source of its services.

62. OpenAI's use of Astra threatens TradeSun's reputation. TradeSun's customers include banks, financial institutions, and other enterprises that evaluate the security and reliability of the technology they use for financial and compliance work. Customers who mistakenly believe that TradeSun's ASTRA® is affiliated with, powered by, or supplied by OpenAI may judge TradeSun's services by the safety, security, and performance of OpenAI's Astra models or other activities rather than TradeSun's own technology.

63. OpenAI's own disclosures identify security concerns associated with Astra. On September 1, 2026, OpenAI disclosed that Astra met its "Critical" cybersecurity-capability threshold and required stronger safeguards against cyber misuse and unauthorized model actions, while stating that the strengthened safeguards were sufficient for release. The Associated Press subsequently reported that OpenAI delayed the release of GPT-6.1 Astra, a successor to its commercially available model, because of security concerns raised by its researchers.

64. Customers who mistakenly associate the parties' services may attribute those Astra-specific security concerns to TradeSun's ASTRA®, undermining confidence in TradeSun's services. TradeSun has no control over OpenAI's Astra models, their safeguards, or their performance, and cannot ensure that customers who form those mistaken associations will seek or receive a correction. OpenAI's use of the identical name thus exposes TradeSun's goodwill to the reputation of a different company's technology.

65. OpenAI's conduct impairs TradeSun's ability to sell and expand its ASTRA® services. Prospective customers who believe that TradeSun's ASTRA® is an OpenAI product, or an imple-

mentation of OpenAI's Astra model, may discount TradeSun's independent technology, may assume they can obtain the "same" Astra directly from OpenAI or through Amazon or Microsoft, or may decline to engage with a company they mistakenly perceive as having copied OpenAI's name. Existing customers and partners may question TradeSun's independence, its data-handling practices, and its long-term viability under a name that OpenAI is claiming as its own.

66. TradeSun will be required to spend time and money to counteract the confusion, including through communications to customers, prospects, partners, and integrators, and through corrective marketing reasonably necessary to distinguish TradeSun's ASTRA® from OpenAI's Astra.

67. These injuries to TradeSun's goodwill, reputation, brand identity, and control over its own mark are, by their nature, irreparable and cannot be fully measured or compensated by money damages.

68. OpenAI, meanwhile, has profited and continues to profit from its use of TradeSun's registered mark. Those profits include revenue from Astra-branded API usage, subscriptions, and enterprise agreements that include or are driven by Astra, and distribution and licensing arrangements for Astra through third-party platforms. The records needed to determine those amounts, including Astra usage and billing data, subscription and enterprise sales, customer-acquisition and upgrade data, revenue allocation among models, and distribution receipts, are in OpenAI's exclusive possession.

**FIRST CLAIM FOR RELIEF**

**Infringement of a Federally Registered Trademark**

**15 U.S.C. § 1114(1) — Against All Defendants**

69. TradeSun incorporates by reference the allegations in the preceding paragraphs.

70. TradeSun owns the ASTRA Registration, which is valid, subsisting, and prima facie evidence of TradeSun's exclusive right to use ASTRA® in commerce in connection with the registered services. TradeSun's rights in ASTRA® are senior to any rights Defendants claim in Astra.

71. Without TradeSun's consent, each Defendant has used, and continues to use, in commerce a reproduction, copy, or colorable imitation of the registered ASTRA® mark in connection with the sale, offering for sale, distribution, and advertising of AI services that are related to, and in substantial part identical to, the services covered by the ASTRA Registration. OpCo offers, provides, and sells the Astra-branded services to U.S. customers, and Group directs and participates in the adoption, branding, launch, and promotion of those services, as alleged above.

72. Defendants' use of Astra is likely to cause confusion, to cause mistake, and to deceive as to the source, origin, sponsorship, affiliation, or approval of the parties' respective services, including by causing customers to believe that TradeSun's ASTRA® services originate with, are built on, or are sponsored by or affiliated with OpenAI, and by causing customers to believe that OpenAI's Astra services are associated with TradeSun.

73. Defendants' conduct violates 15 U.S.C. § 1114(1)(a).

74. On information and belief, Defendants' infringement has been and continues to be knowing, willful, and in reckless disregard of TradeSun's rights. Willfulness is not a prerequisite to an award of Defendants' profits under 15 U.S.C. § 1117(a), but it bears on the equities of that award and on the enhancement of damages and the award of attorney's fees.

75. Defendants' infringement has caused and, unless enjoined, will continue to cause TradeSun irreparable injury for which it has no adequate remedy at law. TradeSun is entitled to injunctive relief under 15 U.S.C. § 1116, to recover Defendants' profits, TradeSun's actual damages, and the costs of the action under 15 U.S.C. § 1117(a), to enhanced damages and profits as the Court finds just under 15 U.S.C. § 1117(a), to reasonable attorney's fees because this is an exceptional case, and to the destruction of infringing materials under 15 U.S.C. § 1118.

**SECOND CLAIM FOR RELIEF**

**False Designation of Origin and False Association**

**15 U.S.C. § 1125(a)(1)(A) — Against All Defendants**

76. TradeSun incorporates by reference the allegations in the preceding paragraphs.

77. TradeSun owns valid and protectable rights in ASTRA®, both by virtue of the ASTRA

Registration and by virtue of its continuous use of the mark in commerce since 2021 and the goodwill associated with that use. ASTRA® is inherently distinctive and identifies TradeSun as the source of the AI services sold under the ASTRA® name.

78. Without TradeSun's consent, each Defendant has used, and continues to use, in commerce the Astra name in connection with AI services in a manner that constitutes a false designation of origin and a false or misleading representation of fact, and that is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with TradeSun, and as to the origin, sponsorship, or approval of Defendants' services by TradeSun and of TradeSun's services by Defendants.

79. The likely confusion includes reverse confusion. Defendants' saturation of the market with Astra is likely to cause consumers to believe that TradeSun's ASTRA® services originate with, are built on, or are licensed, sponsored, or approved by OpenAI, and to overwhelm TradeSun's independent identity as the senior user of the mark.

80. Defendants' conduct violates 15 U.S.C. § 1125(a)(1)(A).

81. On information and belief, Defendants' conduct has been and continues to be knowing, willful, and in reckless disregard of TradeSun's rights, for the reasons alleged above.

82. Defendants' conduct has caused and, unless enjoined, will continue to cause TradeSun irreparable injury for which it has no adequate remedy at law. TradeSun is entitled to injunctive relief under 15 U.S.C. § 1116, to recover Defendants' profits, TradeSun's actual damages, and the costs of the action under 15 U.S.C. § 1117(a), to enhanced damages and profits as the Court finds just, to reasonable attorney's fees because this is an exceptional case, and to the destruction of infringing materials under 15 U.S.C. § 1118.

**THIRD CLAIM FOR RELIEF**

**Trademark Infringement Under California Common Law**

**Against All Defendants**

83. TradeSun incorporates by reference the allegations in the preceding paragraphs.

84. TradeSun owns valid and senior common-law rights in ASTRA® arising from its continuous use of the mark in commerce, including in California, in connection with its AI services. ASTRA® is distinctive and identifies TradeSun as the source of those services.

85. Without TradeSun's consent, each Defendant has adopted and used, or directed and participated in the adoption and use of, the identical Astra name in connection with related AI services, in California and elsewhere, in a manner that is likely to cause confusion as to the source, sponsorship, affiliation, or approval of the parties' services, including reverse confusion that attributes TradeSun's services to OpenAI.

86. Defendants' conduct constitutes trademark infringement under the common law of California.

87. Defendants' infringement has caused, and unless enjoined will continue to cause, injury to TradeSun's business, sales, goodwill, and reputation. TradeSun is entitled to injunctive relief and to recover its damages in an amount to be proven at trial.

88. On information and belief, Defendants committed the acts alleged above with knowledge of TradeSun's rights and in willful and conscious disregard of them and of the probable injury to TradeSun, and their conduct was despicable, such that it constitutes malice and oppression within the meaning of California Civil Code § 3294. That conduct was authorized, directed, or ratified by officers, directors, or managing agents of each Defendant. TradeSun is therefore entitled to punitive and exemplary damages under California Civil Code § 3294 in an amount sufficient to punish Defendants and deter similar conduct.

**FOURTH CLAIM FOR RELIEF**

**Unfair Competition Under California Common Law**

**Against All Defendants**

89. TradeSun incorporates by reference the allegations in the preceding paragraphs.

90. TradeSun has developed valuable goodwill and an established commercial identity in ASTRA® through years of use, investment, and commercial success.

91. Defendants' adoption, promotion, provision, and sale of related AI services under the

identical Astra name, without TradeSun's consent, misappropriates that goodwill and identity and is likely to cause customers to misidentify TradeSun's services as OpenAI's, or to assume a sponsorship, license, affiliation, or approval that does not exist. That conduct constitutes unfair competition under the common law of California, including by passing off and by creating a likelihood of confusion as to the source and affiliation of the parties' services.

92. Defendants' unfair competition has caused, and unless enjoined will continue to cause, injury to TradeSun's business, commercial relationships, goodwill, and reputation. TradeSun is entitled to injunctive relief and to recover its damages in an amount to be proven at trial.

93. On information and belief, Defendants committed the acts alleged above with knowledge of TradeSun's rights and in willful and conscious disregard of them and of the probable injury to TradeSun, and their conduct was despicable, such that it constitutes malice and oppression within the meaning of California Civil Code § 3294. That conduct was authorized, directed, or ratified by officers, directors, or managing agents of each Defendant. TradeSun is therefore entitled to punitive and exemplary damages under California Civil Code § 3294.

**FIFTH CLAIM FOR RELIEF**

**Unfair Competition**

**California Business and Professions Code § 17200 *et seq.* — Against All Defendants**

94. TradeSun incorporates by reference the allegations in the preceding paragraphs.

95. California's Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Defendants' adoption, promotion, provision, and sale of AI services under the Astra name constitute business acts and practices that are unlawful, unfair, and fraudulent within the meaning of the statute.

96. Defendants' business practices are unlawful because they violate 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A) and California common law, as alleged above.

97. Defendants' business practices are fraudulent because they are likely to deceive members of the public, including enterprise purchasers of AI services, as to the source, sponsorship, affiliation, and approval of the parties' respective services.

98. Defendants' business practices are unfair because they misappropriate the goodwill of a senior trademark owner, threaten to extinguish a smaller competitor's commercial identity through the sheer scale of the junior user's promotion, and offend the policies underlying federal and California trademark law; the harm to TradeSun and to the public from those practices substantially outweighs any conceivable utility of Defendants' use of this particular name for their services, which Defendants could rename at will.

99. TradeSun has suffered injury in fact and has lost money or property as a result of Defendants' unfair competition, including the lost and impaired sales, diminished goodwill, and corrective expenditures alleged above, and therefore has standing under California Business and Professions Code § 17204.

100. Defendants' unfair business practices originate in and are carried out from California, injure a California business, and are continuing. Unless enjoined, they will cause further injury to TradeSun and further deception of the public. TradeSun is entitled to injunctive relief under California Business and Professions Code § 17203.

**PRAYER FOR RELIEF**

TradeSun respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, as follows:

A. A judgment that Defendants have infringed TradeSun's federally registered ASTRA® mark in violation of 15 U.S.C. § 1114(1); have engaged in false designation of origin and false association in violation of 15 U.S.C. § 1125(a)(1)(A); have committed trademark infringement and unfair competition under California common law; and have engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code § 17200 *et seq.*;

B. An injunction, under 15 U.S.C. § 1116, California Business and Professions Code § 17203, and the Court's equitable powers, enjoining Defendants and their officers, agents, servants, employees, attorneys, successors, and assigns, and all persons in active concert or participation with any of them who receive actual notice of the order, from using ASTRA, "Astra," or any mark, name, or model identifier that is confusingly similar to ASTRA®, alone or in combination

with other terms (including without limitation "GPT-6 Astra," "Astra Pro," "Astra Law," and "gpt-6-astra"), in connection with the advertising, promotion, offering, provision, distribution, or sale in United States commerce of AI software, models, or services, or any other goods or services likely to cause confusion with TradeSun's ASTRA® services;

C. An order requiring Defendants to remove the Astra name from their product names, model identifiers, websites, applications, developer documentation, advertising, sales materials, and third-party distribution channels within a time set by the Court, and to provide written notice of the Court's order to their distribution partners, including Amazon Web Services and Microsoft, and to their enterprise customers who purchased Astra-branded services;

D. An order directing Defendants to file with the Court and serve on TradeSun, within thirty days after service on Defendants of such injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction, as provided in 15 U.S.C. § 1116(a);

E. An order under 15 U.S.C. § 1118 directing Defendants to deliver up for destruction, or to permanently remove from circulation, all labels, signs, prints, packages, advertisements, promotional materials, and other articles in their possession, custody, or control bearing the Astra name in connection with the goods and services at issue;

F. An accounting and an award of all profits earned by Defendants that are attributable to their infringement and unfair competition, under 15 U.S.C. § 1117(a) and California law, together with such adjustment of that sum as the Court finds just;

G. An award of TradeSun's actual damages, including lost profits, injury to the value of the ASTRA® mark and TradeSun's goodwill and reputation, the cost of corrective advertising reasonably necessary to dispel the confusion caused by Defendants, and a reasonable royalty, in amounts to be proven at trial;

H. An award of up to three times TradeSun's actual damages under 15 U.S.C. § 1117(a);

I. An award of punitive and exemplary damages under California Civil Code § 3294 on the Third and Fourth Claims for Relief;

J. A determination that this is an exceptional case and an award of TradeSun's reasonable attorney's fees under 15 U.S.C. § 1117(a);

K. An award of TradeSun's costs of suit and of prejudgment and post-judgment interest to the fullest extent permitted by law; and

L. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b) and Civil Local Rule 3-6, TradeSun demands a trial by jury on all issues so triable.

Dated: October 5, 2026

Respectfully submitted,

/s/ Andrew T. Tutt
Andrew T. Tutt (SBN 343206)
**TRIAL LAWYERS FOR JUSTICE**
8235 Santa Monica Blvd.
West Hollywood, CA 90046
Telephone: (919) 699-5905
andrew@tl4j.com

R. Stanton Jones (DC Bar No. 987088)*
**TRIAL LAWYERS FOR JUSTICE**
421 W. Water Street
Decorah, IA 52101
Telephone: (307) 288-4400
stanton@tl4j.com

Ana Juneja (WY Bar No. 8-7159)*
**ANA LAW LLC**
75 E. 3rd Street
Sheridan, WY 82801
Telephone: (307) 207-8500
ana@analaw.com

*Attorneys for Plaintiff TradeSun, Inc.*

*Application for *pro hac vice* admission forthcoming

# EXHIBIT A

Digitally Signed By: United States Patent and Trademark Office
Location: United States Patent and Trademark Office
Date: 2022.05.26 22:34:28 -04'00'

## United States of America
### United States Patent and Trademark Office

# Astra

**Reg. No. 6,746,198**
**Registered May 31, 2022**
**Int. Cl.: 42**
**Service Mark**
**Principal Register**

TradeSun, Inc. (DELAWARE CORPORATION)
2196 Carmel Valley Road
Del Mar, CALIFORNIA 92014

CLASS 42: Software as a service (SAAS) services featuring software using artificial intelligence for document classification, data extraction, and processing of data within any line of business software application

FIRST USE 5-21-2021; IN COMMERCE 5-21-2021

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 90-742,200, FILED 05-28-2021

Katherine Kelly Vidal
Director of the United States
Patent and Trademark Office

# EXHIBIT A
**(*continued*)**

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.